**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————————— ) | |
| UNITED STATES OF AMERICA,            ) | |
| )                                             | |
| Plaintiff,            ) | |
| )                                             | |
| v.            ) | Civil Action No. 20-3441 (ABJ) |
| )                                             | |
| INTUIT INC., *et al.*,            ) | |
| )                                             | |
| Defendants.            ) | |
| ———————————————————— ) | |

## FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on November 25, 2020;

AND WHEREAS, the United States and Defendants, Intuit Inc. ("Intuit") and Credit Karma, Inc. ("Credit Karma"), have consented to entry of this Final Judgment without the taking of testimony, without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to make a divestiture to remedy the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants represent that the divestiture and other relief required by this Final Judgment can and will be made and that Defendants will not later raise a claim of hardship or difficulty as grounds for asking the Court to modify any provision of this Final Judgment;

NOW THEREFORE, it is ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

The Court has jurisdiction over the subject matter of and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.    DEFINITIONS

As used in this Final Judgment:

A.    "Acquirer" means Square or any other entity to which Defendants divest the Divestiture Assets.

B.    "Intuit" means Defendant Intuit Inc., a Delaware corporation with its headquarters in Mountain View, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "Credit Karma" means Defendant Credit Karma, Inc., a Delaware corporation with its headquarters in San Francisco, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

D.    "Square" means Square, Inc., a Delaware corporation with its headquarters in San Francisco, California, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

E.    "CKT" means Credit Karma Tax, Inc., a wholly owned subsidiary of Credit Karma, its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

2

F.      "Divestiture Assets" means all of Defendants' rights, titles, and interests in and to all property and assets, tangible and intangible, wherever located, related to or used or held for use in connection with CKT, including, but not limited to:

1.      the CKT Products;

2.      the CKT IP;

3.      the Credit Karma IP License;

4.      the Credit Karma Trademarks License;

5.      all tangible personal property, including, but not limited to, servers and other computer hardware; research and development activities; all fixed assets, personal property, inventory, office furniture, materials, and supplies;

6.      all contracts, contractual rights, and customer relationships; and all other agreements, commitments, and understandings;

7.      all licenses, permits, certifications, approvals, consents, registrations, waivers, and authorizations issued or granted by any governmental organization, and all pending applications or renewals;

8.      all records and data, including (a) customer lists, accounts, sales, and credit records, (b) manuals and technical information Credit Karma provides to its own employees, customers, suppliers, agents, or licensees, (c) records and research data concerning historic and current research and development activities, and (d) drawings, blueprints, and designs; and

9.      all other intangible property, including (a) commercial names and d/b/a names, (b) technical information, (c) computer software and related documentation, know-how, trade secrets, design protocols, quality assurance and control procedures, (d) design tools and simulation capabilities, and (e) rights in internet web sites and internet domain names.

3

G.      "Divestiture Date" means the date on which the Divestiture Assets are divested to Acquirer.

H.      "Acquirer's Tax Landing Page" means the website on which Acquirer will provide the CKT Products and any applicable internet pages under such domain or sub-domain.

I.      "CKT Actual Filers" means customers who, at any time on or before October 16, 2021, have successfully electronically filed federal or state income tax returns using the CKT Products.

J.      "CKT E-File Product Website" means http://tax.creditkarma.com, including any applicable internet pages under such domain or sub-domain.

K.      "CKT IP" means all intellectual property owned by CKT.

L.      "CKT Landing Page" means www.creditkarma.com/tax, including any applicable internet pages under such domain or sub-domain.

M.      "CKT New Member" means any customer who either (a) creates a Credit Karma account via the CKT Landing Page or (b) creates a Credit Karma account via any internet page other than the CKT Landing Page and, within 24 hours of creating that Credit Karma account, provides Credit Karma with the additional authentication required for filing a U.S. federal tax return.

N.      "CKT Product Link" means any link, advertisement, reference to tax or tax filing (including "file now" or similar links) with respect to CKT Products, or the CKT Tax Button, on the applicable internet website menu banners and pages.

O.      "CKT Products" means all products and services, including all digital do-it-yourself personal United States federal or state income tax return preparation and e-filing products and services developed, manufactured, delivered, made commercially available, marketed,

distributed, supported, sold, offered for sale, imported or exported for resale, or licensed out by, for, or on behalf of CKT.

P.      "CKT Tax Button" means (a) with respect to the Credit Karma Website, the link that is labeled "Tax," and (b) with respect to any CKT mobile application, the navigation element that is labeled "Tax."

Q.      "Credit Karma IP" means all intellectual property, except for the Credit Karma Trademarks, owned by Credit Karma that is used or held for use in connection with Credit Karma Products and which is embodied in or related to the development, provision, operation, or support of digital do-it-yourself personal United States federal or state income tax return preparation and e-filing products and services.

R.      "Credit Karma IP License" means a non-exclusive, worldwide, fully paid-up, perpetual, irrevocable, non-transferable license to the Credit Karma IP for Acquirer's use in the development, provision, operation, and support of all existing and future digital do-it-yourself personal United States federal or state income tax return preparation and e-filing products and services.

S.      "Credit Karma New Member" means any customer who creates a Credit Karma account for the first time following the Divestiture Date and prior to the later of (a) April 16, 2021, or (b) the date of any federal filing deadline required by the Internal Revenue Service for federal income tax returns and tax payments for the tax year ending December 31, 2020, if such federal filing deadline is expressly extended beyond April 15, 2021, excluding persons who were referred to Credit Karma by Intuit.

T.      "Credit Karma Products" means all products and services, excluding CKT Products, provided by Defendants using the "Credit Karma" brand name.

U.      "Credit Karma Trademarks" means all trademarks, service marks, internet domain names, trade dress, trade names, other names, or source identifiers, including all such registrations, applications for registrations, and associated goodwill, owned by Credit Karma that is used or held for use in connection with Credit Karma Products and which is embodied in or related to the development, provision, operation, or support of digital do-it-yourself personal United States federal or state income tax return preparation and e-filing products and services.

V.      "Credit Karma Trademarks License" means a limited, non-exclusive, non-transferrable, non-assignable, non-sublicensable license to the Credit Karma Trademarks for Acquirer's use in the development, provision, operation, and support of all existing and future digital do-it-yourself personal United States federal or state income tax return preparation and e-filing products and services during the Year 1 Period.

W.      "Credit Karma Website" means www.creditkarma.com and any applicable internet pages under such domain or sub-domain.

X.      "Other Tax Product" means, except for the Divestiture Assets, any digital do-it-yourself personal United States federal or state income tax return preparation and e-filing product or service, including, but not limited to, Intuit's TurboTax.

Y.      "Protected User" means any person who is a CKT Actual Filer, a Tax Intent User, or a Credit Karma New Member.

Z.      "Relevant Personnel" means:

1.      all full-time, part-time, or contract employees of CKT at any time between February 24, 2020, and the Divestiture Date; and

2.      all full-time, part-time, or contract employees of Credit Karma, wherever located, who dedicated at least 50% of such person's time to the development, provision,

6

operation, or support of the digital do-it-yourself personal United States federal or state income

tax return preparation and e-filing products and services at any time between October 1, 2019, and

September 30, 2020.

The United States, in its sole discretion, will resolve any disagreement regarding which employees

are Relevant Personnel.

AA.    "Tax Intent User" means any customer (a) in the case of a user of the Credit Karma

Website, (i) who clicks on a CKT Product Link, (ii) who accesses the CKT Tax Landing Page or

the CKT E-File Product Website, or (iii) who accesses the Credit Karma Website, CKT Tax

Landing Page, or CKT E-File Product Website through a link provided through electronic mail or

other notifications sent by Defendants on behalf of Acquirer or otherwise pursuant to Paragraph

IV.M.1. or through other promotional or marketing materials distributed or made available by

Acquirer, and (b) in the case of a user of the Credit Karma mobile application, (i) who clicks on a

CKT Product Link or (ii) who accesses the application through a link provided through electronic

mail or other notifications sent by Defendants on behalf of Acquirer or otherwise pursuant to

Paragraph IV.M.1. or through other promotional or marketing materials distributed or made

available by Acquirer.

BB.    "Year 1 Period" means the period beginning on the Divestiture Date and ending on

October 16, 2021.

CC.    "Year 2 Period" means the period beginning on October 17, 2021, and ending on

the later of (a) June 14, 2022, or (b) 60 calendar days following any extension of the federal filing

deadline required by the Internal Revenue Service for federal income tax returns and tax payments

for the tax year ending December 31, 2021, if such federal filing deadline is expressly extended

beyond April 15, 2022.

## III.    APPLICABILITY

A.    This Final Judgment applies to Intuit and Credit Karma, as defined above, and all other persons in active concert or participation with any Defendant who receive actual notice of this Final Judgment.

B.    If, prior to complying with Section IV and Section V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of business units that include the Divestiture Assets, Defendants must require any purchaser to be bound by the provisions of this Final Judgment.  Defendants need not obtain such an agreement from Acquirer.

## IV.    DIVESTITURE

A.    Defendants are ordered and directed, within 30 calendar days after the Court's entry of the Asset Preservation Stipulation and Order in this matter, to divest the Divestiture Assets in a manner consistent with this Final Judgment to Square or to another Acquirer acceptable to the United States, in its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed 60 calendar days in total and will notify the Court of any extensions.

B.    Defendants must use their best efforts to divest the Divestiture Assets as expeditiously as possible and may not take any action to impede the certification, operation, or divestiture of the Divestiture Assets.

C.    Unless the United States otherwise consents in writing, divestiture pursuant to this Final Judgment must include the entire Divestiture Assets and must be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by Acquirer as part of a viable, ongoing business of the development, provision, operation, and support of digital do-it-yourself personal United States federal or state income tax return

8

preparation and e-filing products and services, and that the divestiture to Acquirer will remedy the competitive harm alleged in the Complaint.

D.      The divestiture must be made to an Acquirer that, in the United States' sole judgment, has the intent and capability (including the necessary managerial, operational, technical, and financial capability) to compete effectively in the development, provision, operation, and support of digital do-it-yourself personal United States federal or state income tax return preparation and e-filing products and services.

E.      The divestiture must be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between Acquirer and Defendants gives Defendants the ability unreasonably to raise Acquirer's costs, to lower Acquirer's efficiency, or otherwise to interfere in the ability of Acquirer to compete effectively.

F.      In the event Defendants are attempting to divest the Divestiture Assets to an Acquirer other than Square, Defendants promptly must make known, by usual and customary means, the availability of the Divestiture Assets.  Defendants must inform any person making an inquiry regarding a possible purchase of the Divestiture Assets that the Divestiture Assets are being divested in accordance with this Final Judgment and must provide that person with a copy of this Final Judgment.  Defendants must offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets that are customarily provided in a due-diligence process; *provided, however,* that Defendants need not provide information or documents subject to the attorney-client privilege or work-product doctrine.  Defendants must make all information and documents available to the United States at the same time that the information and documents are made available to any other person.

G.      Defendants must provide prospective Acquirers with (1) access to make inspections of the Divestiture Assets; (2) access to all environmental, zoning, and other permitting documents and information; and (3) access to all financial, operational, or other documents and information customarily provided as part of a due diligence process.  Defendants also must disclose all encumbrances on any part of the Divestiture Assets, including on intangible property.

H.      Defendants must cooperate with and assist Acquirer to identify and hire all Relevant Personnel.

1.      Within 10 business days following the filing of the Complaint in this matter, Defendants must identify all Relevant Personnel to Acquirer and the United States, including by providing organization charts covering all Relevant Personnel.

2.      Within 10 business days following receipt of a request by Acquirer, the United States, or the monitoring trustee, Defendants must provide to Acquirer, the United States, and the monitoring trustee additional information related to Relevant Personnel, name, job title, reporting relationships, past experience, responsibilities, training and educational history, relevant certifications, and job performance evaluations.  Defendants must also provide to Acquirer current, recent, and accrued compensation and benefits, including most recent bonus paid, aggregate annual compensation, current target or guaranteed bonus, if any, any retention agreement or incentives, and any other payments due, compensation or benefits accrued, or promises made to the Relevant Personnel.  If Defendants are barred by any applicable law from providing any of this information, Defendants must provide, within 10 business days following receipt of the request, the requested information to the full extent permitted by law and also must provide a written explanation of Defendants' inability to provide the remaining information.

3.      At the request of Acquirer, Defendants must promptly make Relevant Personnel available for private interviews with Acquirer during normal business hours at a mutually agreeable location.

4.      Defendants must not interfere with any effort by Acquirer to employ any Relevant Personnel.  Interference includes, offering to increase the compensation or benefits of Relevant Personnel unless the offer is part of a company-wide increase in compensation or benefits granted that was announced prior to February 24, 2020, or has been approved by the United States, in its sole discretion.  Defendants' obligations under this Paragraph IV.H.4. will expire 12 months after the divestiture of the Divestiture Assets pursuant to this Final Judgment.

5.      For Relevant Personnel who elect employment with Acquirer within 12 months of the Divestiture Date, Defendants must waive all non-compete and non-disclosure agreements, vest and pay on a prorated basis any bonuses, incentives, other salary, benefits, or other compensation fully or partially accrued at the time of transfer to Acquirer; vest all unvested pension and other equity rights; and provide all other benefits that those Relevant Personnel otherwise would have been provided had the Relevant Personnel continued employment with Defendants, including, any retention bonuses or payments.  Defendants may maintain reasonable restrictions on disclosure by Relevant Personnel of Defendants' proprietary non-public information that is unrelated to the Divestiture Assets and not otherwise required to be disclosed by this Final Judgment.

6.      For a period of 12 months from the date on which any Relevant Personnel is hired by Acquirer, Defendants may not solicit to rehire Relevant Personnel who were hired by Acquirer within 12 months of the Divestiture Date unless (a) an individual is terminated or laid off by Acquirer or (b) Acquirer agrees in writing that Defendants may solicit to rehire that individual.

11

Nothing in this Paragraph IV.H.6. prohibits Defendants from advertising employment openings using general solicitations or advertisements and rehiring Relevant Personnel who apply for an employment opening through a general solicitation or advertisement.

      I.     Defendants must warrant to Acquirer that (1) the Divestiture Assets will be operational and without material defect on the date of their transfer to Acquirer; (2) there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets; and (3) Defendants have disclosed all encumbrances on any part of the Divestiture Assets, including on intangible property.  Following the sale of the Divestiture Assets, Defendants must not undertake, directly or indirectly, challenges to the environmental, zoning, or other permits pertaining to the operation of the Divestiture Assets.

      J.     Defendants must assign, subcontract, or otherwise transfer all contracts, agreements, and customer relationships (or portions of such contracts, agreements, and customer relationships) included in the Divestiture Assets, including all supply and sales contracts, to Acquirer; *provided, however,* that for any contract or agreement that requires the consent of another party to assign, subcontract, or otherwise transfer, Defendants must use best efforts to accomplish the assignment, subcontracting, or transfer.  Defendants must not interfere with any negotiations between Acquirer and a contracting party.

      K.     Defendants must make best efforts to assist Acquirer to obtain all necessary licenses, registrations, certifications, and permits to operate the Divestiture Assets.  Until Acquirer obtains the necessary licenses, registrations, certifications, and permits, Defendants must provide Acquirer with the benefit of Defendants' licenses, registrations, certifications, and permits to the full extent permissible by law.

L.      At the option of Acquirer, and subject to approval by the United States in its sole discretion, on or before the Divestiture Date, Defendants must enter into a transition services agreement for engineering, product support, data migration, information security, information technology, technology infrastructure, customer support, marketing, finance, accounting, and knowledge-transfer related to the tax industry, for a period of up to 24 months on terms and conditions reasonably related to market conditions for the provision of the transition services.  Any amendments to or modifications of any provision of a transition services agreement are subject to approval by the United States, in its sole discretion.  Acquirer may terminate a transition services agreement, or any portion of a transition services agreement, without penalty at any time upon commercially reasonable notice.  The employee(s) of Defendants tasked with providing transition services must not share any competitively sensitive information of Acquirer with any other employee of Defendants.

M.      For the duration of the Year 1 Period Defendants:

1.      must distribute Acquirer-created marketing content to CKT Actual Filers via electronic mail and mobile application notifications, with the same frequency of distribution as CKT-created marketing content for the 12 months prior to the Divestiture Date;

2.      must continue to make the CKT mobile application available through the same mobile application distribution channels as for the 12 months prior to the Divestiture Date;

3.      must use reasonable best efforts to support Acquirer's efforts to obtain consents of customers under Section 7216 of the Internal Revenue Code and Treasury Regulations thereunder;

4.      must continue to make the CKT Products available to customers at all times with at least the same level of quality, functionality, availability, access, and customer support as was provided by Defendants during the 12 months prior to the Divestiture Date;

5.      (a) must cause any person who clicks on a CKT Product Link or accesses the CKT Landing Page or CKT E-File Product Website to be directed to the CKT Products, and (b) must not (i) direct or cause to be directed any person who clicks on a CKT Product Link or accesses the CKT Landing Page or CKT E-File Product Website to any Other Tax Product, or (ii) show any person who clicks on a CKT Product Link or accesses the CKT Landing Page or CKT E-File Product Website any links to or advertisements for any Other Tax Product;

6.      must not market, provide any links to, or otherwise make available Other Tax Products on the Credit Karma Website or mobile application, including the CKT Landing Page, to any user of the Credit Karma Website or mobile application who (a) is not logged in to the Credit Karma Website or mobile application or (b) is a Protected User; and

7.      to the extent Defendants market, provide any links to, or otherwise make available Other Tax Products on the Credit Karma Website or mobile application, including the CKT Landing Page, to any user of the Credit Karma Website or mobile application who is both (a) logged in to the Credit Karma Website or mobile application and (b) not a Protected User, Defendants must also market the CKT Products on equal and non-discriminatory terms and in a manner that does not reduce the efficacy or prominence of the CKT Tax Button and is not otherwise inconsistent with the terms of Section IV.

N.      For the duration of the Year 2 Period, Defendants:

1.      must distribute Acquirer-created marketing content to CKT Actual Filers via up to 6 electronic mail and mobile application notifications; and

14

2.    (a) must cause any CKT Actual Filers who click on a CKT Product Link or access the CKT Landing Page or CKT E-File Product Website to be directed to the Acquirer's Tax Landing Page, and (b) without first verifying that a person is not a CKT Actual Filer or Credit Karma New Member, must not (i) direct or cause to be directed any person who clicks on a CKT Product Link or accesses the CKT Landing Page or CKT E-File Product Website to any Other Tax Product, or (ii) show any person who clicks on a CKT Product Link or accesses the CKT Landing Page or CKT E-File Product Website any links to or advertisements for any Other Tax Product.

O.    For the duration of both the Year 1 Period and the Year 2 Period, Defendants:

1.    must maintain the CKT Tax Button; and

2.    must not market or promote to any CKT Actual Filers any products or services that compete, either directly or indirectly, with the CKT Products, via electronic mail marketing that is (a) deliberately directed at such CKT Actual Filers based on their statuses as CKT Actual Filers or (b) delivered to CKT Actual Filers at the email addresses associated with such CKT Actual Filers' accounts with Credit Karma.  Notwithstanding the foregoing, Defendants may communicate via email to any CKT Actual Filers who used Defendants' Free File tax software for federal income tax returns and tax payments for the prior tax year for the purpose of complying with Defendants' obligations under the IRS Free File Program.

P.    Unless Acquirer directs Defendants to retain such data for a longer period, and except as required in Paragraph IV.Q., within 30 calendar days after the Divestiture Date, Defendants must delete any data collected from or provided by CKT Actual Filers during the tax preparation or filing process that Credit Karma has in its possession, including, but not limited to, (a) any such data CKT has provided to Credit Karma pursuant to the consent of customers under Section 7216 of the Internal Revenue Code and Treasury Regulations thereunder and (b) any such

data indicating whether a CKT Actual Filer is a CKT New Member.  If Acquirer directs Defendants to retain such data for a longer period, Defendants must delete such data within 30 calendar days after Acquirer directs Defendants to delete such data.  Within 5 calendar days of Defendants' deletion of this data, Defendants must (i) provide to the United States and to the monitoring trustee a written certification, signed by Defendants' respective General Counsels, that all data covered by this Paragraph IV.P. has been deleted and is no longer in the possession or control of Defendants and (ii) provide a copy of such certification to Acquirer.

Q.     Defendants may maintain information to indicate whether a customer is a CKT Actual Filer solely for the purpose of complying with Paragraphs IV.L., IV.M., IV.N., IV.O., and IV.P.  Within 10 calendar days following the end of the Year 2 Period, Defendants must delete (a) the data that Defendants maintain for purposes of complying with Paragraphs IV.L., IV.M., IV.N., IV.O., and IV.P. and which identify a customer as a CKT Actual Filer and (b) any remaining data that Defendants possess that could be used to identify a customer as a CKT Actual Filer or as a CKT New Member, including any data described in Paragraph IV.P.  Within 5 calendar days of Defendants' deletion of this data, Defendants must (i) provide to the United States and to the monitoring trustee a written certification, signed by Defendants' respective General Counsels, that all data covered by this Paragraph IV.Q. has been deleted and is no longer in the possession or control of Defendants, and (ii) provide a copy of such certification to Acquirer.

R.     If any term of an agreement between Defendants and Acquirer, including, but not limited to, an agreement to effectuate the divestiture required by this Final Judgment, varies from a term of this Final Judgment, to the extent that Defendants cannot fully comply with both, this Final Judgment determines Defendants' obligations.

## V.     APPOINTMENT OF DIVESTITURE TRUSTEE

16

A.      If Defendants have not divested the Divestiture Assets within the period specified in Paragraph IV.A., Defendants must immediately notify the United States of that fact in writing. Upon application of the United States, which Defendants may not oppose, the Court will appoint a divestiture trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.      After the appointment of a divestiture trustee by the Court, only the divestiture trustee will have the right to sell the Divestiture Assets.  The divestiture trustee will have the power and authority to accomplish the divestiture to an Acquirer acceptable to the United States, in its sole discretion, at a price and on terms as are then obtainable upon reasonable effort by the divestiture trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and will have other powers as the Court deems appropriate.  The divestiture trustee must sell the Divestiture Assets as quickly as possible.

C.      Defendants may not object to a sale by the divestiture trustee on any ground other than malfeasance by the divestiture trustee.  Objections by Defendants must be conveyed in writing to the United States and the divestiture trustee within 10 calendar days after the divestiture trustee has provided the notice of proposed divestiture required under Section VI.

D.      The divestiture trustee will serve at the cost and expense of Defendants pursuant to a written agreement, on terms and conditions, including confidentiality requirements and conflict of interest certifications, that are approved by the United States.

E.      The divestiture trustee may hire at the cost and expense of Defendants any agents or consultants, including, but not limited to, investment bankers, attorneys, and accountants, that are reasonably necessary in the divestiture trustee's judgment to assist with the divestiture trustee's duties.  These agents or consultants will be accountable solely to the divestiture trustee and will

17

serve on terms and conditions, including terms and conditions governing confidentiality requirements and conflict-of-interest certifications, that are approved by the United States in its sole discretion.

F.      The compensation of the divestiture trustee and agents or consultants hired by the divestiture trustee must be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement that provides the divestiture trustee with incentives based on the price and terms of the divestiture and the speed with which it is accomplished.  If the divestiture trustee and Defendants are unable to reach agreement on the divestiture trustee's compensation or other terms and conditions of engagement within 14 calendar days of the appointment of the divestiture trustee by the Court, the United States may, in its sole discretion, take appropriate action, including by making a recommendation to the Court.  Within three business days of hiring an agent or consultant, the divestiture trustee must provide written notice of the hiring and rate of compensation to Defendants and the United States.

G.      The divestiture trustee must account for all monies derived from the sale of the Divestiture Assets sold by the divestiture trustee and all costs and expenses incurred.  Within 30 calendar days of the date of the sale of the Divestiture Assets, the divestiture trustee must submit that accounting to the Court for approval.  After approval by the Court of the divestiture trustee's accounting, including fees for unpaid services and those of agents or consultants hired by the divestiture trustee, all remaining money must be paid to Defendants and the trust will then be terminated.

H.      Defendants must use their best efforts to assist the divestiture trustee to accomplish the required divestiture.  Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendants must

provide the divestiture trustee and agents or consultants retained by the divestiture trustee with full and complete access to all personnel, books, records, and facilities of the Divestiture Assets. Defendants also must provide or develop financial and other information relevant to the Divestiture Assets that the divestiture trustee may reasonably request.  Defendants may not take any action to interfere with or to impede the divestiture trustee's accomplishment of the divestiture.

I.      The divestiture trustee must maintain complete records of all efforts made to sell the Divestiture Assets, including by filing monthly reports with the United States setting forth the divestiture trustee's efforts to accomplish the divestiture ordered by this Final Judgment.  The reports must include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in the Divestiture Assets and must describe in detail each contact with any such person.

J.      If the divestiture trustee has not accomplished the divestiture ordered by this Final Judgment within six months of appointment, the divestiture trustee must promptly provide the United States with a report setting forth: (1) the divestiture trustee's efforts to accomplish the required divestiture; (2) the reasons, in the divestiture trustee's judgment, why the required divestiture has not been accomplished; and (3) the divestiture trustee's recommendations for completing the divestiture.  Following receipt of that report, the United States may make additional recommendations consistent with the purpose of the trust to the Court.  The Court thereafter may enter such orders as it deems appropriate to carry out the purpose of this Final Judgment, which may include extending the trust and the term of the divestiture trustee's appointment by a period requested by the United States.

K.      The divestiture trustee will serve until divestiture of all Divestiture Assets is completed or for a term otherwise ordered by the Court.

L.      If the United States determines that the divestiture trustee is not acting diligently or in a reasonably cost-effective manner, the United States may recommend that the Court appoint a substitute divestiture trustee.

## VI.      NOTICE OF PROPOSED DIVESTITURE

A.      Within two business days following execution of a definitive divestiture agreement, Defendants or the divestiture trustee, whichever is then responsible for effecting the divestiture, must notify the United States of a proposed divestiture required by this Final Judgment.  If the divestiture trustee is responsible for completing the divestiture, the divestiture trustee also must notify Defendants.  The notice must set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets.

B.      Within 15 calendar days of receipt by the United States of this notice, the United States may request from Defendants, the proposed Acquirer, other third parties, or the divestiture trustee additional information concerning the proposed divestiture, the proposed Acquirer, and other prospective Acquirers.  Defendants and the divestiture trustee must furnish the additional information requested within 15 calendar days of the receipt of the request unless the United States provides written agreement to a different period.

C.      Within 45 calendar days after receipt of the notice required by Paragraph VI.A. or within 20 calendar days after the United States has been provided the additional information requested pursuant to Paragraph VI.B., whichever is later, the United States will provide written notice to Defendants and any divestiture trustee that states whether or not the United States, in its

sole discretion, objects to Acquirer or any other aspect of the proposed divestiture.  Without written notice that the United States does not object, a divestiture may not be consummated.  If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Paragraph V.C. of this Final Judgment. Upon objection by Defendants pursuant to Paragraph V.C., a divestiture by the divestiture trustee may not be consummated unless approved by the Court.

      D.      No information or documents obtained pursuant to this Section VI may be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand-jury proceedings, for the purpose of evaluating a proposed Acquirer or securing compliance with this Final Judgment, or as otherwise required by law.

      E.      In the event of a request by a third party for disclosure of information under the Freedom of Information Act, 5 U.S.C. § 552, the Antitrust Division will act in accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7.  Persons submitting information to the Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7.  Designations of confidentiality expire ten years after submission, "unless the submitter requests and provides justification for a longer designation period."  *See* 28 C.F.R. § 16.7(b).

      F.      If at the time that a person furnishes information or documents to the United States pursuant to this Section VI, that person represents and identifies in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and marks each pertinent page of such material, "Subject to claim of

protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give that person ten calendar days' notice before divulging the material in any legal proceeding (other than a grand-jury proceeding).

## VII.    FINANCING

Defendants may not finance all or any part of Acquirer's purchase of all or part of the Divestiture Assets made pursuant to this Final Judgment.

## VIII.    ASSET PRESERVATION OBLIGATIONS

Until the divestiture required by this Final Judgment has been accomplished, Defendants must take all steps necessary to comply with the Asset Preservation Stipulation and Order entered by the Court.  Defendants must take no action that would jeopardize the divestiture ordered by the Court.

## IX.    AFFIDAVITS

A.    Within 20 calendar days of the filing of the Complaint in this matter, and every 30 calendar days thereafter until the divestiture required by this Final Judgment has been completed, Defendants each must deliver to the United States an affidavit, signed by each Defendant's Chief Financial Officer and General Counsel, describing the fact and manner of Defendants' compliance with this Final Judgment.  The United States, in its sole discretion, may approve different signatories for the affidavits.

B.    Each affidavit must include:  (1) the name, address, and telephone number of each person who, during the preceding 30 calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, an interest in the Divestiture Assets and describe in detail each contact with such persons during that period; (2) a description of the efforts Defendants have taken to solicit buyers for and

complete the sale of the Divestiture Assets and to provide required information to prospective Acquirers; and (3) a description of any limitations placed by Defendants on information provided to prospective Acquirers.  Objection by the United States to information provided by Defendants to prospective Acquirers must be made within 14 calendar days of receipt of the affidavit, except that the United States may object at any time if the information set forth in the affidavit is not true or complete.

C.       Defendants must keep all records of any efforts made to divest the Divestiture Assets until one year after the divestiture has been completed.

D.       Within 20 calendar days of the filing of the Complaint in this matter, Defendants also must each deliver to the United States an affidavit signed by each Defendant's Chief Financial Officer and General Counsel, that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment.  The United States, in its sole discretion, may approve different signatories for the affidavits.

E.       If Defendants make any changes to the efforts and actions outlined in any earlier affidavits provided pursuant to Paragraph IX.D., Defendants must, within 15 calendar days after any change is implemented, deliver to the United States an affidavit describing those changes.

F.       Defendants must keep all records of any efforts made to preserve the Divestiture Assets until one year after the divestiture has been completed.

## X.       APPOINTMENT OF MONITORING TRUSTEE

A.       Upon motion of the United States, which Defendants cannot oppose, the Court will appoint a monitoring trustee selected by the United States and approved by the Court.

B.      The monitoring trustee will have the power and authority to monitor Defendants'

compliance with the terms of this Final Judgment and the Asset Preservation Stipulation and Order

entered by the Court and will have other powers as the Court deems appropriate.  The monitoring

trustee will have no responsibility or obligation for operation of the Divestiture Assets.

C.      Defendants may not object to actions taken by the monitoring trustee in fulfillment

of the monitoring trustee's responsibilities under any Order of the Court on any ground other than

malfeasance by the monitoring trustee.  Objections by Defendants must be conveyed in writing to

the United States and the monitoring trustee within 10 calendar days of the monitoring trustee's

action that gives rise to Defendants' objection.

D.      The monitoring trustee will serve at the cost and expense of Defendants pursuant

to a written agreement with Defendants and on terms and conditions, including terms and

conditions governing confidentiality requirements and conflict of interest certifications, that are

approved by the United States.

E.      The monitoring trustee may hire, at the cost and expense of Defendants, any agents

and consultants, including, but not limited to, investment bankers, attorneys, and accountants, that

are reasonably necessary in the monitoring trustee's judgment to assist with the monitoring

trustee's duties.  These agents or consultants will be solely accountable to the monitoring trustee

and will serve on terms and conditions, including terms and conditions governing confidentiality

requirements and conflict-of-interest certifications, that are approved by the United States.

F.      The compensation of the monitoring trustee and agents or consultants retained by

the monitoring trustee must be on reasonable and customary terms commensurate with the

individuals' experience and responsibilities.  If the monitoring trustee and Defendants are unable

to reach agreement on the monitoring trustee's compensation or other terms and conditions of

engagement within 14 calendar days of the appointment of the monitoring trustee, the United States, in its sole discretion, may take appropriate action, including by making a recommendation to the Court.  Within three business days of hiring any agents or consultants, the monitoring trustee must provide written notice of the hiring and the rate of compensation to Defendants and the United States.

G.     The monitoring trustee must account for all costs and expenses incurred.

H.     Defendants must use their best efforts to assist the monitoring trustee to monitor Defendants' compliance with their obligations under this Final Judgment and the Asset Preservation Stipulation and Order.  Subject to reasonable protection for trade secrets, other confidential research, development, or commercial information, or any applicable privileges, Defendants must provide the monitoring trustee and agents or consultants retained by the monitoring trustee with full and complete access to all personnel, books, records, and facilities of the Divestiture Assets.  Defendants may not take any action to interfere with or to impede accomplishment of the monitoring trustee's responsibilities.

I.     The monitoring trustee must investigate and report on Defendants' compliance with this Final Judgment and the Asset Preservation Stipulation and Order, including ensuring Defendants' compliance with any transition services agreement.  The monitoring trustee must provide periodic reports to the United States setting forth Defendants' efforts to comply with their obligations under this Final Judgment and under the Asset Preservation Stipulation and Order.  The United States, in its sole discretion, will set the frequency of the monitoring trustee's reports.

J.     The monitoring trustee will serve until the divestiture of all Divestiture Assets pursuant to this Final Judgment or until expiration of any transition services agreement pursuant

to Paragraph IV.L., whichever is later, unless the United States, in its sole discretion, determines a shorter period is appropriate.

K.      If the United States determines that the monitoring trustee is not acting diligently or in a reasonably cost-effective manner, the United States may recommend that the Court appoint a substitute.

## XI.    COMPLIANCE INSPECTION

A.      For the purposes of determining or securing compliance with this Final Judgment or of related orders such as the Asset Preservation Stipulation and Order or of determining whether this Final Judgment should be modified or vacated, upon written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, and reasonable notice to Defendants, Defendants must permit, from time to time and subject to legally recognized privileges, authorized representatives, including agents retained by the United States:

1. to have access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants relating to any matters contained in this Final Judgment; and

2. to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews must be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.      Upon the written request of an authorized representative of the Assistant Attorney General for the Antitrust Division, Defendants must submit written reports or respond to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment.

C.      No information or documents obtained pursuant to this Section XI may be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand jury proceedings, for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.      In the event of a request by a third party for disclosure of information under the Freedom of Information Act, 5 U.S.C. § 552, the Antitrust Division will act in accordance with that statute, and the Department of Justice regulations at 28 C.F.R. part 16, including the provision on confidential commercial information, at 28 C.F.R. § 16.7.  Defendants submitting information to the Antitrust Division should designate the confidential commercial information portions of all applicable documents and information under 28 C.F.R. § 16.7.  Designations of confidentiality expire 10 years after submission, "unless the submitter requests and provides justification for a longer designation period."  *See* 28 C.F.R. § 16.7(b).

E.      If at the time that Defendants furnish information or documents to the United States pursuant to this Section XI, Defendants represent and identify in writing information or documents for which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," the United States must give Defendants 10 calendar days' notice before divulging the material in any legal proceeding (other than a grand jury proceeding).

## XII.    NO REACQUISITION; LIMITATIONS ON JOINT VENTURES, PARTNERSHIPS, OR COLLABORATIONS

Defendants may not reacquire any part of or any interest in the Divestiture Assets during the term of this Final Judgment.  In addition, Defendants may not, without the prior written consent

of the United States, enter into a new joint venture, partnership, or collaboration, including any marketing or sales agreement, or expand the scope of an existing joint venture, partnership, or collaboration with Acquirer involving any digital do-it-yourself tax return preparation and e-filing products and services during the term of this Final Judgment.  The decision whether to consent to any joint venture, partnership, or collaboration is within the sole discretion of the United States.

## XIII.   RETENTION OF JURISDICTION

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIV.   ENFORCEMENT OF FINAL JUDGMENT

A.    The United States retains and reserves all rights to enforce the provisions of this Final Judgment, including the right to seek an order of contempt from the Court.  Defendants agree that in a civil contempt action, a motion to show cause, or a similar action brought by the United States regarding an alleged violation of this Final Judgment, the United States may establish a violation of this Final Judgment and the appropriateness of a remedy therefor by a preponderance of the evidence, and Defendants waive any argument that a different standard of proof should apply.

B.    This Final Judgment should be interpreted to give full effect to the procompetitive purposes of the antitrust laws and to restore the competition the United States alleged was harmed by the challenged conduct.  Defendants agree that they may be held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as interpreted by the Court in light of these procompetitive principles and applying ordinary tools of interpretation, is stated

specifically and in reasonable detail, whether or not it is clear and unambiguous on its face.  In any such interpretation, the terms of this Final Judgment should not be construed against either party as the drafter.

C.      In an enforcement proceeding in which the Court finds that Defendants have violated this Final Judgment, the United States may apply to the Court for a one-time extension of this Final Judgment, together with other relief that may be appropriate.  In connection with a successful effort by the United States to enforce this Final Judgment against a Defendant, whether litigated or resolved before litigation, that Defendant agrees to reimburse the United States for the fees and expenses of its attorneys, as well as all other costs including experts' fees, incurred in connection with that enforcement effort, including in the investigation of the potential violation.

D.      For a period of four years following the expiration of this Final Judgment, if the United States has evidence that a Defendant violated this Final Judgment before it expired, the United States may file an action against that Defendant in this Court requesting that the Court order:  (1) Defendant to comply with the terms of this Final Judgment for an additional term of at least four years following the filing of the enforcement action; (2) all appropriate contempt remedies; (3) additional relief needed to ensure the Defendant complies with the terms of this Final Judgment; and (4) fees or expenses as called for by this Section XIV.

## XV.    EXPIRATION OF FINAL JUDGMENT

Unless the Court grants an extension, this Final Judgment will expire 10 years from the date of its entry, except that after five years from the date of its entry, this Final Judgment may be terminated upon notice by the United States to the Court and Defendants that the divestiture has been completed and the continuation of this Final Judgment is no longer necessary or in the public interest.

## XVI.   PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest.  The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including by making available to the public copies of this Final Judgment and the Competitive Impact Statement, public comments thereon, and any response to comments by the United States.  Based upon the record before the Court, which includes the Competitive Impact Statement and, if applicable, any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

AMY BERMAN JACKSON
United States District Judge

DATE:  August 2, 2021

30